IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


JAMES CLARK and PAUL MOORE,      )

              Plaintiffs      )

        v.      )          No.  3:06-cv-046

LOCKHEED MARTIN ENERGY      )
SYSTEMS, INC., and WACKENHUT
SERVICES, INC.,      )

            Defendants      )


## MEMORANDUM OPINION


This is an action alleging race discrimination in employment and retaliation brought pursuant to Title VII, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981 by two current salaried security officers employed by defendant Wackenhut Services, Inc. - Oak Ridge (Wackenhut).  They also bring employment discrimination claims against their former employer, Lockheed Martin Energy Systems, Inc. (Lockheed Martin), which was Wackenhut's predecessor in providing security services for the Department of Energy at its nuclear facilities in Oak Ridge, Tennessee.  Currently pending are motions for summary judgment of both defendants [Court Files #7, #9, #11 regarding plaintiff James Clark and Court Files

#11, #13, #15 regarding plaintiff Paul Moore].  For the reasons that follow, those motions will be granted and this action dismissed.


I.

***Factual Background***

This case involves the Y-12 Plant in Oak Ridge, Tennessee.  Effective January 10, 2000, the Department of Energy (DOE) selected Wackenhut to replace Lockheed Martin as the security and related support services contractor for four DOE facilities in Oak Ridge.  These four facilities house classified materials pertaining to national security, secret scientific research, and the development of nuclear weapons.  The Y-12 Plant maintains the nation's stockpile of weapons-grade uranium.  Improper access to any of these Oak Ridge facilities threatens national security, could benefit foreign governments or terrorist groups, and jeopardizes the safety of the nation's military and civilian populations.  Thus, the security of the Y-12 Plant is vital to national security.


The work performed by security guards at Y-12, Security Police Officers (SPOs) and Security Officers (SOs) as they are officially called, is subject to extensive DOE regulations that apply to Protective Force personnel at government-owned facilities like Y-12.  *See* 10 CFR Part 1046.  These regulations require SPOs

to meet certain physical fitness and other requirements, at specified intervals, to maintain their status. DOE regulation 10 CFR § 1046.14 expressly requires all protective force personnel to have a "current access authorization for the highest level of classified matter to which they potentially have access." Wackenhut requires its SOs and SPOs to obtain and maintain a "Q"-Clearance as a condition of their employment.

At Lockheed Martin, employment was subject to the company's Equal Employment Opportunity/Affirmative Action (EEO/AA) policy. The policy prohibits discrimination based on race, religion, color, sex, national origin, and age. The policy covered recruitment in employment, promotion, demotion, transfer, layoff and termination, and other working conditions including maintenance of a work environment free of physical, psychological, and verbal harassment on the basis of age, sex, ancestry, color, disability, national origin, race/ethnicity, religion/creed, or veteran status. An Employee Concern Response Program (ECRP) was also promulgated in the Lockheed Martin employee handbook. The ECRP encouraged employees to report concerns about EEO/AA matters to their direct manager or the next appropriate level of management. Concerns could be reported orally or in writing. Other avenues for reporting concerns included the bargaining unit, Safety and Health representatives, the Y-12 Safety Work Action Team, and the I Care - We Care Program.

II.

*The Defendants' Promotion Policies*

Before addressing the plaintiffs' claims with regard to alleged failures to promote, it is helpful to review the process that Lockheed Martin used throughout the 1990s in promoting employees to the position of Captain, Major, Sector Commander, and Site (sometimes called Shift) Commander in the Protective Services Organization at Y-12 and the policies that were used by Wackenhut after it took control.

Under Lockheed Martin, the first step in the promotion process was the issuance of a staffing requisition (an authorization to fill a vacant position) and the development of a job description. The job vacancy would then be posted and advertised for a specific period, usually 10 days, during which interested employees could submit applications. Lockheed Martin claims that it was committed to the principle of diversity. It therefore required that the applicant pool be diverse. If the initial applicant pool was not diverse, the job could either be re-posted or the Division Director could "go out and encourage females and minorities to compete for the job." Once the applicant pool was established, the applicants were screened to make sure each of them met the requirements of the job. An applicant could be disqualified if

he/she did not meet the job requirements or if the applicant had active discipline in effect and had reached a certain level in the attendance program.

Next there was a separate interview of each qualified applicant. Lockheed Martin used what is called a structured interview process. Each applicant was interviewed by two supervisors from the Protective Services Organization, and the interviewers all had training in the interview process. Under the structured process, the interviewers interviewed each applicant, using the same set of questions, which were geared to the requirements of the job being filled. The interviewers scored the applicants' response to each question. When the interview was over, the interviewers would discuss the respective scores and then come to a consensus as to what the applicant's score would be. After all applicants had been interviewed and scored, the applicants would then be rank-ordered according to their respective interview scores.

The next step in Lockheed Martin's promotion process involved the Promotion Review Board, which was comprised of all of the chiefs of all Oak Ridge sites and various other Protective Service Organization's employees. The Board, which existed from 1994 until 2000, was provided with the rank order scores from the interviews and other pertinent information regarding the applicants. The Board held a separate meeting with respect to each job. The interviewers attended the

Board's meeting to answer questions about their evaluations and their scoring of the applicants. The function of the Board was to make sure that the promotion processes had been conducted in accordance with company procedure and to make a recommendation to the Hiring Manager about which applicant should be awarded the job. The decision regarding the award of the job was made by the Hiring Manager and the Protective Services Organization Division Director.

In the vast majority of cases, the Promotion Review Board recommended that the vacant position be awarded to the applicant who received the highest interview score. And in the vast majority of cases, that was the applicant to whom the position was awarded. If, however, the interview scores were very close as between a black and white applicant, or a female and male applicant, and there was an under-utilization of minorities or females in the position being filled, the Hiring Manager and Division Director would award the position to a minority or female, as the case may have been, and thus use race or gender as a plus-factor in addressing under-utilization.

When in the year 2000 DOE awarded Wackenhut the contract to provide the security services, one of the conditions was that Wackenhut offer employment to the uniform guards who had been employed by Lockheed Martin. At that time, Wackenhut had no process in place for reviewing promotions, but approximately 17

vacant positions needed to be filled by January 10, 2000.  In this interim period, the process worked as follows:  Steven Gibbs, who was to become Director of Wackenhut Pro Forces, and Gary Brandon, who was to become Wackenhut's Manager of Pro Forces at Y-12, "put a lot of time and effort" in reviewing the eligible candidates so as to be sure the employees they recommended were the most qualified for the positions to be filled.  Having worked with the Pro Force employees at Lockheed Martin for 10 years, Gibbs and Brandon were familiar with their strengths and job performance records.  Wackenhut contends that the process was competitive and, as Gibbs put it, he gave everyone a fair shake, as he had been instructed to do.  After completing this process, Gibbs made his final recommendation to then Wackenhut General Manager, Walt Ferguson, who made the final decision.

The end result was that 17 Lockheed Martin employees were promoted to fill the vacant positions at Wackenhut between October 1999 and February 21, 2001.  Five of the promotions were awarded to African-Americans, one of whom was Paul Moore, a guard plaintiff, and one of whom was an African-American female; five promotions were awarded to white females;  and seven promotions were awarded to white males.  In May 2000, Wackenhut adopted a promotion/filling vacancies policy similar to that had been in place under Lockheed Martin, and since then all promotions/vacancies have allegedly been handled in accordance with that

policy. Wackenhut contends that as it settled into its role, it adopted and refined its policies for the routine filling of non-bargaining unit jobs. For a time, Wackenhut retained most of the features of Lockheed Martin's promotions process. The first step was the issuance of a staffing requisition (an authorization to fill a vacant position) and the development of a job description. The job vacancy (including the requirements of the job) would then be posted or advertised for a specified period, first 10 and later 14 days, during which interested employees could submit applications. The applications would include a form as well as a candidate's resume.

Like Lockheed Martin, Wackenhut required that applicant pools be diverse; if the initial applicant pool was not diverse, the job would be re-posted. Once the applicant pool was established, the applicants were screened to make sure each one met the requirements of the job. An applicant could be disqualified if he/she did not meet the job requirements or if the applicant had active discipline in effect or had reached a certain level in the attendance program.

Next there was a separate interview for each qualified applicant. Wackenhut continued using the structured interview process. Each applicant was interviewed by two supervisors from the Protective Services Organization, with one being the "Hiring Manager" who would supervise the successful candidate, and a

representative from Wackenhut's Human Resources Department, typically Recruiting and Staffing Specialist Barbara Bright Ward. All interviewers had received training in the interview process, and Wackenhut contends that it has continued to provide such training.

Again, under the structured process, the interviewers interviewed each applicant, using the same set of questions, which were geared to the requirements of the job being filled. The interviewers noted the applicants' responses to each question. When the interview ended, the interviewers would discuss their respective notes and then reach a consensus as to what the applicants' scores should be. Wackenhut contends that it expects its interviewers to focus on the responses given, and to omit consideration of the candidates' work history to the extent it is known. After all of the applicants had been interviewed and scored, the applicants would then be rank-ordered according to their respective scores.

Wackenhut did not adopt Lockheed Martin's Promotion or Review Board as part of its promotion process. Instead, the Hiring Manager would report to the Director of Protective Forces, Steve Gibbs, and would almost always recommend that the vacant position be awarded to the applicant who received the highest score. The hiring manager and Gibbs might, however, at that point discuss or factor into their thinking their personal knowledge of the candidates' work histories.

In the vast majority of cases, Wackenhut awarded the position to the applicant with the highest interview score. If, however, the interview scores were very close, as between a black and white applicant, or a female and male applicant, and there was an under-utilization of minorities or females in the position being filled, Gibbs would confer with Wackenhut Human Resources. Wackenhut could then award the position to a minority or female, as the case may be, and thus use race or gender as a plus-factor in addressing under-utilization.

Wackenhut contends that essentially the transition from Lockheed Martin's process to its own was seamless, as Wackenhut deleted only the Promotion Board element from what Lockheed Martin had done. Later, Wackenhut devised new interview questions intended to invigorate the process for both the candidates and the interviewers who had become familiar over time with the Lockheed Martin era questions. Further, Wackenhut developed a "matrix" or spreadsheet that would tally candidates interview scores, as well as points given if candidates had a required or desired qualification. Wackenhut contends that thus far, this "matrix" has tracked the interview scores such that other points for required or desired qualifications have not changed the rank order arising from interview scores; the highest interview score has also yielded the highest overall score. For the most part, however, Wackenhut's process and Lockheed Martin's process are similar.

III.

**_The Defendants' Methods of Determining Pay Rates_**

Salary increases at Lockheed Martin were initially determined by the Compensation Department, a central office. Increases were determined by the Compensation Department on the basis of three factors: (1) the funds available for increases; (2) the employees' performance evaluations; and (3) the position of the employee within the salary rate range for the position held. The Compensation Department would inform the employees and management of its determination. Management had the discretion to change the increase slightly based on specific performance factors or leave it as made by the Compensation Department.

Lockheed Martin gave annual performance evaluations to salaried employees, using seven categories of ratings. From highest to lowest, they were: Distinguished (DS); Consistently Exceeds (CX); Consistently Meets (CM); Needs Improvement (NI); Unacceptable (UA); Progressing Satisfactorily (PR), given during the first six months to new hires or employees on a new assignment; and EA to employees who cannot be rated because of absences.

Under Lockheed Martin's compensation program, several different factors impacted an employee's earnings within a certain job title. Among these

were job knowledge, skill level, performance and time-in-grade, as is related to rate range and percentage of mid-point.  In the case of two people with equal time in a job, but one performing at a higher level, the one at the higher performance level would, customarily, receive higher merit increases, and thus, higher pay.  If in the case of two people with similar performance, but one having more years of service in the job, the person with the greater service time would be moved further along in the rate range toward mid-point.  As a person approached mid-point in the rate range, the individual might, in fact, have received a smaller merit increase than someone who had a lower performance rating but was further away from the mid-point.

The concept of the mid-point in the compensation was explained as follows:

> Each salaried position was given a level in which there was a minimum of 80% of center and a maximum of 120% of center.  To illustrate the point, assume a salary range from $80 on the low end and $120 on the high end.  And, so where you fit in that range would depend on a number of things, performance appraisals and those kinds of things. ...  If you were at that grade, you  ...  couldn't go below that level and you wouldn't go below that [level].  The mid-point in this illustration would be $100.

Clements' Dep. at 501-02.

Every Lockheed Martin employee received an annual pay increase. The amount of that increase varied depending in large part on the employee's annual performance review ratings. Other subjective factors could affect an employee's pay increase including the quality of peer relationships, an employee's critical skills that he or she contributed to the company, and long-term performance (as opposed to that year's performance in particular).

The pay system for employee performance review was called the Development Planning and Performance Review (DPPR). An employee's immediate supervisor performed the review on an annual basis. Each employee was assigned an overall rating, which are set out above. Lockheed Martin limited the number of people who could achieve the highest ratings of DS and CX to between 35% and 42% of the workforce, and therefore limited the number of people who could achieve the higher raises.

Protective Services Chief Steve Gibbs was one of the officials who determined which employees were bumped out of an initial premium rating. He described the process he used to do so: For all salaried employees, Gibbs obtained ranked lists of the employees for each position (*e.g.*, Lieutenant or Captain) that he would then meld together to create one complete rank-ordered list, taking the first ranked Lieutenant from each list and ranking them, then the second ranked

Lieutenant and ranking them behind the first-ranked Lieutenants, and continuing down the list until he filled up the quota for the premium rankings. Thus, employees who earned a CX, but whose forced rankings by Gibbs under the methodology brought them below the quota, had their rankings forced into the CM category. Gibbs also exercised discretion on occasion to order a change on an employee's rating when he disagreed with how a supervisor evaluated a subordinate. Gibbs testified, however, that disagreeing with a supervisor was a rare occurrence.

Wackenhut continued a similar method of deciding employee raises when it took over the contract in January 2000.

IV.

***Work History of James Clark***

Plaintiff James Clark was initially hired in 1989 by Lockheed Martin as a security inspector at Y-12 and was promoted twice during his ten-year tenure with Lockheed Martin. Clark had a Bachelor's degree from Knoxville College in Communications that he had received in 1987. In 1995, while Clark was employed at Lockheed Martin, he earned a Master's of Education in Administration and Supervision from Lincoln Memorial University. On January 10, 2000, when Wackenhut took over the government contract at Y-12, Wackenhut offered Clark the

same position that he had held at Lockheed Martin before the transition; that is, that of Sector Commander. In June of 2002, Clark received a promotion to a Captain position (formerly "Site Commander"), a position for which he had applied three times previously over the course of four years and for which he was not able to apply in 2000 because the position was not posted.

Plaintiff Clark claims he was denied appropriate promotions while working for Lockheed Martin, during the transition from Lockheed Martin to Wackenhut, and while working for Wackenhut.

First, plaintiff contends that he was improperly denied a promotion to Site Commander which he applied for in 1995. Later, he was denied a promotion to Site Commander in 1999, as well as during the transition period from Lockheed Martin to Wackenhut in 2000. Finally, Clark contends that he was not permitted to apply for the position of Major in 2002 and again in 2004, after the instant lawsuit had been filed. In 2005, Clark again applied for the position of Major, but this time, an African-American who is not involved in this lawsuit, James McBride, received the position. Plaintiff claims that during the time that he has worked for Lockheed Martin and Wackenhut, he has been denied promotions and equal pay because of his race. He contends that he has been the victim of a racially hostile work environment and that the defendants have failed to provide him an integrated work environment with

other high level African-Americans.  He further contends that defendants have drug tested African-American employees more often than white employees.  Finally, Clark contends that Wackenhut has retaliated against him for the filing of this lawsuit.

Clark's work history shows that he was first hired by Martin Marietta as a security guard at the Y-12 Plant in 1989.  He was promoted to a salaried position outside the bargaining unit in 1990, to the position of Fire and Guard Captain, a supervisory position.  Clark was a Fire and Guard Captain and a Major for two years.  In 1992, he applied for a Sector Commander position.  A Sector Commander was responsible for supervising a portion of the Y-12 site.  Clark described his Sector Commander position as a more responsible and highly paid position that involved managing the most sensitive area of the Y-12 Plant.  Lockheed Martin concluded that Clark was the most qualified applicant and awarded him that job in August 1992.  In 1995, Clark applied for the position of Site Commander, who was essentially in charge of the entire site during a shift.  Several other people applied for that position, and after the interviews were completed, this job was given to Roy Hamby, a white male, who was the highest rated applicant in the interview process.

Plaintiff Clark again applied for a promotion to Site Commander in 1999.  That position was awarded to Kathy Szymanski, a white female.  Although the records concerning the interviews cannot be located, testimony demonstrates that

Szymanski was awarded the job either because she got the highest interview score or because the interview scores as between her and two other applicants were so close that the job was awarded to her to address the under-utilization of females in the Site Commander position.

Plaintiff Clark also complains that during his years with the defendants, blacks were subject to racial discrimination with respect to discipline, he was falsely accused of sexual harassment in December 1999, the work site was a hostile work environment with systemic discrimination, blacks were drug tested more often than whites, and blacks received less than equal pay with whites.

V.

***Work History of Paul Moore***

Plaintiff Paul Moore was initially hired as a security inspector, or armed guard, at the Y-12 facility in 1980. During the entirety of his employment, Moore has received only two promotions: to a Lieutenant position in 1987 and to a Captain position in 2000, shortly after Wackenhut took control of the Protective Services Organization at Y-12. During that time, he has received numerous "premium" performance evaluations, multiple awards for his job performance, and the praise of members of supervision as a good employee. He was denied promotions to the

Captain position on numerous occasions between 1991 and 2000, finally receiving the position after 13 years as a Lieutenant. He claims that despite his stellar performance evaluations, he regularly received lower percentage raises compared to other white salaried employees who received similar performance ratings, as well as compared to those white employees in the Lieutenant and Captain positions. Further, he claims that his "Q" clearance was inexplicably pulled for nearly 18 months while he was employed by Wackenhut, thereby preventing him from competing for jobs requiring the clearance. Finally, he claims that he suffered through a hostile work environment, which included the repeated presence of racially hostile graffiti, racist jokes told by supervisors, and the imprudent invasion of his and other African-American employees' privacy.

## VI.

### *Summary Judgment Standards*

Pursuant to Rule 56, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law.

Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In assessing the validity of a summary judgment motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in a light most favorable to the opponent of the motion. However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. *Catrett*, 477 U.S. at 322.

VII.

### Title VII Standards

The order, allocation, and standard of proof in Title VII and § 1981 cases is governed by the three-part analysis set forth in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973). *See also, Mitchell v. Toledo Hospital*, 964 F.2d 477, 582 (6th Cir. 1992) (the same substantive analysis applies to Title VII and § 1981 claims). Under this analytical framework, the plaintiff bears the initial burden of establishing a *prima facie* case of employment discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53. If the plaintiff succeeds in proving a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the contested action. *Id.*

Once the defendant satisfies this burden, the burden shifts back to the plaintiff to show that defendant's proffered reason is really a pretext for discrimination. *Id.* at 254-55. An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was insufficient to motivate the challenged conduct. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.2d 1070, 1084 (6th Cir. 1984). In challenging an employer's action, an employee "must demonstrate that the employer's reasons are not true." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1988). Plaintiff at all times bears the ultimate burden of persuasion that the employer's conduct was the product of intentional race discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-12 (1993).

VIII.

**The Failure to Promote Claims**


To establish a *prima facie* case for failure to promote, a plaintiff must show (1) that he is a member of a protected class, (2) that he was qualified for the job, (3) that he suffered an adverse employment decision, and (4) that the job was given to a person outside his protected class. *Hopson v. Daimler Chrysler Corp.*, 306 F.3d 426, 433 (6th Cir. 2002). Once plaintiff establishes a *prima facie* case, the burden shifts to Lockheed Martin or Wackenhut to offer a legitimate, non-discriminatory reason for the adverse employment action. *Hopson*, 306 F.3d at 433. If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext. *Burdine*, 450 U.S. at 253.


a. Plaintiff Clark's Failure to Promote Claims

After being promoted to Sector Commander in 1992, Clark applied for a promotion to the next highest supervisory position of Site Commander in 1995. Several other people applied for the job, including Roy Hamby, James Locke, and Bobby Beaty, all of whom had significantly more company service and supervisory experience than Clark. After the interviews were completed, the position was awarded to Hamby, a white male, the highest ranked applicant in the interview

process. Although the records concerning the interview scores are no longer available, it was Steve Gibbs' recollection that Hamby received the top score in the interview process. Hamby had been hired at Y-12 in 1977, 11 years prior to Clark. In 1985, Lockheed Martin promoted Hamby to Fire and Guard Captain, and following a series of good evaluations, he was promoted to Sector Commander in October 1991 and then to Site Commander in 1995. Steve Gibbs testified that the key factor in Hamby's selection, however, was his interview score.

Although Mr. Clark had more education than Mr. Hamby, it is undisputed that Hamby had more than five years of supervisory experience more than Clark and had received annual performance evaluations that were at least as good as Clark's. The court finds that Hamby had more experience than Clark and that Clark's subjective feelings that he had just as much experience as Hamby should not cause the court to substitute its judgment for Clark's employer's, who reasonably determined that Hamby was the most qualified for the promotion. Accordingly, Clark has failed to demonstrate that race played any factor in the decision to award the 1995 job to Mr. Hamby.

Plaintiff Clark next claims that Lockheed Martin should have promoted him to Site Commander in 1999 instead of Kathy Szymanski. Ms. Szymanski was a white female employee who had been hired by Lockheed Martin in 1988. She

worked as a part of the Special Response Team until December 1989. From December 1989 until June 1995, she was assigned to the Central Training Facility where she conducted weapons and tactical instruction for entry level and incumbent SPOs, semi-annual weapons qualification training, and taught advanced tactics and firearms for Special Response Teams. In June 1995, Szymanski successfully applied for the position of Sector Commander at Y-12. Four years later, in June 1999, she successfully applied for the position of Site Commander at Y-12. She was the first female to attain an award for proficiency with firearms and received the "High Woman Award" in a number of competitive matches involving firearms.

Plaintiff Clark makes two claims regarding Szymanski, one involving her promotion to Sector Commander in 1995 and the other involving her promotion to Site Commander in 1999. With regard to her promotion to Sector Commander, Clark contends that she did not have one of the requirements for that job, in that she did not meet the requirement that the applicant have two years in-plant experience as a supervisor. It should be noted that Clark himself did not apply for the Sector Commander position that was awarded to Szymanski in 1995. The record shows that Lockheed Martin treated her work in a non-bargaining unit position at the Central Training Facility as sufficient to satisfy the supervisory experience requirement. There is no factual basis in the record for concluding that Lockheed

Martin was not justified in finding that Szymanski met the requirements of the job and in awarding her the job in 1995, which Clark himself had not applied for.

Clark's other complaint about Szymanski relates to the Site Commander job awarded her in 1999. In April 1999, Lockheed Martin posted a job vacancy for that position. This opening occurred when O. L. Duncan, the former Site Commander, retired. Initially there were five applicants for the job, one female (Szymanski) and four males, one of whom was black (Clark). To be a qualified applicant for the Site Commander vacancy, an employee had to have at least one year of experience as a Sector Commander. One of the five applicants (Milligan) did not meet this requirement and was therefore disqualified and removed from the process. The other four candidates, Larry Garrett, Robert Mullins, Kathy Szymanski and James Clark, were interviewed. Although the records concerning the interview notes cannot be located, testimony showed that Szymanski was awarded the job because either the got the highest interview score or because interview scores as between her, Garrett and Mullins were so close that she was awarded the job in order to address the under-utilization of females in the Site Commander position. After the promotion in 1999, Szymanski was the only female Site Commander in Lockheed Martin's Protective Services Organization in Oak Ridge. Testimony indicates that the scoring on the interviews showed that Garrett, Mullins and

Szymanski were all very close. Billy Greeley, a PSO Division Representative, testified that Clark had the lowest interview score of the four applicants.

After Szymanski accepted the Site Commander position, effective June 1, 1999, Lockheed Martin notified Clark and the other unsuccessful applicants that Szymanski had been selected and told them to contact the requisitioning supervisor, Steve Gibbs, if they had any questions about the decision. Clark did not contact Gibbs regarding the decision to award the job to Szymanski.

Plaintiff Clark claims with regard to Wackenhut's promotion decisions begin with the promotion of James Locke to the position of Site Commander effective January 10, 2000. Clark first claims that the position was given to Locke without it being posted. However, no posting was done on those initial promotions because the DOE contract was awarded to Wackenhut in 1999 and became effective January 10, 2000. Wackenhut had to fill 17 vacant positions before that date, including the position of Site Commander. At the time, Wackenhut had no procedures in place and had no feasible way of posting the positions. Wackenhut requested two experienced individuals, Gibbs and Brandon, who were slated to become the Director and Manager of Wackenhut's Pro Forces, to review the employees in Lockheed Martin's workforce and to recommend individuals to fill each of the 17 vacant positions. Gibbs and Brandon had held supervisory positions in

Lockheed Martin's Pro Force for many years and were therefore more familiar with the workforce than anyone else. The record shows that Gibbs and Brandon spent considerable time deciding upon the individuals to recommend, and there is nothing in the record to demonstrate that the process or recommendations they made were arbitrary or discriminatory. The successful employee, James Locke, was well qualified for the position of Site Commander. Clark himself admitted that a reasonable person could have found that Locke was the person to whom the job should have been awarded. It must also be noted that five of the 17 employees promoted on the basis of the Gibbs/Brandon recommendations were African-Americans. In addition, five of those promoted were women.

The law does not prohibit an employer from using its discretion in filling management vacancies so long as the employer does so in a non-discriminatory manner. *Browning v. Army*, 436 F.3d 692, 698 (6th Cir. 2006). There is no evidence in the record to create a question of material fact with respect to whether Wackenhut discriminated against the plaintiff when it made the 17 promotions which it was required to carry out when it took over the DOE contract in 2000.

Plaintiff Clark's next claim relates to the promotion of Robert Mullins to Site Commander in September 2000. This promotion was made under the promotion policy/procedures that Wackenhut adopted in May 2000. It is undisputed

that Mullins received the highest score from the interviewers who interviewed the applicants for the job. In addition, besides Mullins, four other employees received a higher score than Clark's and one of the two employees that tied for second place in those interviews was an African-American. Therefore, if the job had not been awarded to Mullins, the record is undisputed that it would have been awarded either to Garrett (white) or to McBride (black). While plaintiff Clark may believe that he was the most qualified candidate for the job, that belief was not shared by Sam Thompson (black) and Ray McClure (white), the two supervisors who interviewed and scored the applicants. Clark claims that he was not given enough credit for his education, but that does not raise an issue with respect to his race. There is no evidence upon which a reasonable jury could find that Clark was discriminated against by Thompson and McClure when they determined the scores of the applicants.

Plaintiff Clark also claims that he was denied the opportunity to apply for the position of Major in 2002. The Major position is one of the highest in the Protective Forces at Y-12. There is only one Major on each shift. To be eligible to apply for the position of Major, Wackenhut requires an applicant to meet certain job qualifications, one of which is to have held the position of Captain for at least two years. Wackenhut concluded that Clark was not qualified for the Major position when he applied for it in July 2002 because, at the time, he had never held the

position of Captain. It is undisputed that Pitt Tarrant, who received the position, met all of its requirements. The record also shows that Wackenhut applied this type of prior service requirement evenhandedly to all applicants for supervisory positions, regardless of race. For example, in the case of the Major's job that Clark applied for in 2004, Wackenhut disqualified two white employees, Ray Hubbs and James Wayland, out of the eight applicants.

Plaintiff next claims that he was discriminated against in the promotion of Isaac Simmons (black) to a Major's job in 2004. Clark contends that Isaac Simmons did not have all of the qualifications for the job and Wackenhut "bent the rules" by allowing individuals such as Simmons, who did not meet all of the qualifications, to apply for the job. However, the record demonstrates that the Major's job in 2004 had two alternative requirements, one of which Simmons met. It is undisputed that in screening for the Major's job in 2004, Barbara Bright Ward found that four applicants met the requirements for the job (Clark, Simmons, and two others), and that two other applicants (Hubbs and Wayland), both white, were not eligible because they did not meet the job requirements. Two other applicants withdrew from the process. The end result was that Simmons, Clark, and the two other qualified applicants were interviewed for the job by three interviewers, Ward, Thompson and Tillery, the latter being the Hiring Manager. The job was then awarded to Simmons because he received the highest interview score. Clark

maintains that Wackenhut's award of the job to Simmons constituted retaliation against him for filing this lawsuit.  However, it is undisputed that at the time Clark was interviewed, two of the interviewers, Sam Thompson (black) and Mike Tillery (white), the Hiring Manager, did not know that Clark had filed the lawsuit.  There is simply no evidence in the record to dispute Wackenhut's claim that Simmons got the job because he had the highest interview score and that the lawsuit was never mentioned by any of the interviewers during the interview process.  It is also undisputed that since the lawsuit was filed, Clark has received "excellent performance reviews."  Accordingly, there is no evidence in the record by which Clark can establish a *prima facie* case of retaliation.

Finally, plaintiff complains about the promotion of James McBride, also an African-American, to a Major's job in May 2005.  Again, it is undisputed that McBride received the job because he had the highest interview score.  There is no evidence in the record from which the factfinder could conclude that McBride's higher interview score was a subterfuge intended to deny the position to Clark.

b.  Plaintiff Moore's Failure to Promote Claim

Plaintiff Paul Moore's claims with regard to promotion are based upon the alleged failure of Lockheed Martin to promote him from Lieutenant to Captain during the 1990s.  Most of these are outside of any applicable statute of limitations.

Moreover, plaintiff Moore has not indicated a single instance in which someone was promoted from Lieutenant to Captain over him in spite of Moore having obtained a higher score on the interview or otherwise being better qualified for the job. There is also no evidence to indicate that Moore ever complained about being passed over for promotion while he was an employee of Lockheed Martin.

Plaintiff Moore complains that race discrimination was a factor in a 1998 promotion from Lieutenant to Captain which Joan Valentine received over him. However, Moore does not dispute that the promotion from Lieutenant to Captain was from a mainly non-supervisory position to a supervisory position. He also does not dispute that Ms. Valentine trained at the FBI Training Academy in Quantico, Virginia, and at the Federal Law Enforcement Center in Glenco, Georgia. Ms. Valentine also has an Associate's Degree from Hiwassee College and has worked as a Capitol Police Officer in Washington, D.C. Moore admitted that he lacked the training and education of Ms. Valentine. Ms. Valentine received an interview score of 352.25, well ahead of Moore's 318.50. Moore's assertion that he was better qualified and more experienced than Valentine is simply not supported by any evidence of record. No reasonable jury could conclude that race played any part in the 1998 Valentine promotion.

With respect to promotions after Wackenhut became his employer, plaintiff Moore has not indicated any promotion decisions where he was the most qualified applicant but nevertheless did not receive the promotion. Rather, his claims with respect to Wackenhut arise out of an allegedly racist decision to change his level of security temporarily and a racially hostile work environment.

IX.

### Plaintiffs' Claims of Discrimination in Pay

Both plaintiffs Clark and Moore claim that they were discriminated against in their pay by Lockheed Martin because "pay raises are based in large part on annual performance appraisals that are subjective and discriminatory. ...." However, subjectivity, without more, does not establish pretext. *See Browning*, 436 F.3d at 696. To establish a *prima facie* case of discrimination in compensation, Clark and Moore must demonstrate that the defendants paid them lower wages than they paid employees outside the protected class for equal work. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). However, it is not unlawful for an employer to pay employees holding the same position different salaries if the decision is based on factors other than race and on a bona fide seniority or merit system, provided the differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(h).

The record in this case shows that under Lockheed Martin and Wackenhut's compensation plans, the employee's position and terms of the mid-point of the salary range for the position, employee's performance rating, and the time since the employee's last increase were factors that resulted in the increases and the differences between plaintiffs' pay and that of white comparators.

In this case, the record is undisputed that Clark was given a CX performance rating in every year but 1999 and was given significant salary increases in every year that he was employed by Lockheed Martin, including 1999. His gross income increased during that same period from $38,952 to $65,232.58 yearly. In his deposition, Clark testified that his pay discrimination claim is based on his contention that five other white employees (Spradlen, Osborne, Velar, Young and Monhollen) received larger raises than he did. However, an understanding of how Lockheed Martin and Wackenhut's compensation system works makes it clear that there was no salary discrimination between Clark and any of the other five employees. Because they all had different years of experience, work performance evaluations, and other factors which went into the determination of their yearly increases, none of these employees are comparators to which plaintiff Clark can compare himself. Although Clark does point out that in some years he received a lesser percentage of increase than some white employees with the same rank, the logical explanation for those slight differences lies in the fact that plaintiff Clark advanced very rapidly,

as he himself admitted, through the ranks of the supervisory positions at Lockheed Martin. That meant that some of the white employees of the same rank would have had more years of service, and that factored into the slightly larger percentage increases in the pay that they received. Accordingly, the court finds that plaintiff Clark has failed to demonstrate that his compensation was based on discriminatory factors either during his employment with Lockheed Martin or his employment with Wackenhut.

With respect to his pay claim, plaintiff Moore compares himself to Jon Justice, Gary Brandon, and James Tanner. However, Justice and Brandon were Operations Officers at ORNL and Y-12, respectively; they were known as "Assistant Chiefs" and served as second-in-command over all Protective Forces at their DOE installations. Tanner, meanwhile, was a Y-12 Site Commander, also known as "Shift Commander" and "Shift Captain," four ranks higher than Moore. Accordingly, none of these individuals can be considered "comparators" to plaintiff Moore with respect to his compensation.

In conclusion, neither Clark nor Moore can establish that there was any discrimination on the basis of their race in the compensation they received while employed by Lockheed Martin or Wackenhut.

X.

**Plaintiffs' Hostile Work Environment Claims**

Both plaintiffs Clark and Moore contend that they were subjected to a racially hostile work environment throughout the time that they worked for Lockheed Martin and Wackenhut. To establish a *prima facie* case for a hostile work environment, the plaintiffs must each demonstrate that (1) he belongs to a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment was based on race, (4) the harassment affected a term, condition or privilege of employment, and (5) the employer knew or should have known about the harassment and failed to take action. *Moore v. KUKA Welding Sys., Inc.*, 171 F.3d 1078-79 (6th Cir. 1999). A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment or create an abusive work environment." *Id.* "The conduct must be severe enough or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Id.* The Supreme Court has consistently held that "simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms or conditions of employment." *Faragher*, 524 U.S. at 788.

Plaintiff Clark mentions three sets of events which he claims created the hostile work environment. The first is an incident where Clark's supervisor, Site Commander J. R. Tanner told Clark to give "coaching and counseling" to two black employees on account of their infractions of Lockheed Martin's attendance policies. Clark maintains that he protested the instruction because there was another white employee who was not scheduled for discipline, although he supposedly had a discipline problem as bad as the two black employees. After allegedly reviewing the records at Clark's request, Tanner rescinded the order to discipline the two black employees. Clark cannot say when the incident occurred, but it appears have occurred sometime between 1995 and 2000. Since no disciplinary action was taken against Clark or anyone else, this incident does not suggest the creation of a hostile work environment.

Second, plaintiff Clark claims that in the changing room there was sometimes racial graffiti. Clark contends that he observed racial graffiti in the Men's Restroom in the early 1990s "on numerous occasions." In Clark's verified EEOC

charge against Lockheed Martin, signed on June 16, 2000, roughly six months after he left Lockheed Martin's employment, Clark alleged: "I have also experienced a racially hostile environment of Lockheed Martin. For example, on one occasion the Men's Restroom was covered with racial slurs such as 'nigger,' 'black monkey,' and 'black ass.' Several people complained about the graffiti. While the graffiti was subsequently removed in a matter of days, the company made no effort to condemn this activity or to prevent its recurrence." Testimony of several other plaintiffs in similar claims does not support the amount of graffiti which plaintiff alleges. Plaintiff Paul Sheard testified that he saw racial graffiti only "several times" in the change house, that it was promptly removed as soon as it was reported to management, and that he had not seen graffiti since the latter part of Mike Bradshaw's reign as department head, which ended in 1996. John Davidson's testimony is much to the same effect. Instead of supporting Clark's position, the testimony of Sheard and Davidson supports the conclusion that there was some problem with racial graffiti in the early 1990s, but that Lockheed Martin addressed the matter in a prompt and effective way. Certainly there is nothing with respect to the graffiti in those years that would interfere with the plaintiff's ability to carry out his work.

Plaintiff Clark also cites two "racial comments" in support of his hostile working environment claim against Lockheed Martin. One involves a non-supervisory SPO by the name of Charlie "Red" King, who is now dead. Clark claims

that at some unspecified time in the mid-1990s, he overheard King make a racial comment about him to some unidentified person. The first mention Clark made of this alleged comment was in a declaration he signed in 2006. Clark did not report this comment at the time it allegedly occurred.

The second racial comment allegedly involves Paul Sheard. Clark argues that Steve Gibbs told Sheard that he (Sheard) was "dangerous" because he had a college education. However, Gibbs did not make this statement directly to Sheard. Sheard testified that SPO Floyd Glenn heard Sheard say that "Steve Gibbs thought I [Sheard] was dangerous because I had a college education." In any event, the statement had nothing to do with Clark and does not appear to be racial in nature. Moreover, Glenn was a non-supervisory co-worker, not a management employee, whose testimony about what Sheard told him concerning what Gibbs supposedly told Glenn is clearly inadmissible hearsay.

Finally, the court observes that of the isolated racial comments supposedly made, they were made by non-supervisory employees and there is nothing in the record to indicate any involvement by supervisory employees or that supervisory employees would not appropriately respond to complaints about racial comments if plaintiff had raised them.

With respect to defendant Wackenhut, Clark also relies on "racial graffiti" and isolated racial comments. The first such comment was one allegedly made by SPO Joe Lackey concerning a black-owned business called FUBU. In a declaration dated March 16, 2006, Clark says he overheard the comment he ascribes to Lackey in June 2000 and claims it was made "within earshot" of several other Wackenhut employees, including an unnamed "white supervisor employee." This is the first reference to that statement by Lackey and Clark did not report it to upper management. Three years earlier, in 2003, when he gave a lengthy deposition, Clark did not mention the Lackey statement.

In his deposition, Clark refers to an incident in which another white SPO, Chuck Foust, referred to a black female co-worker as a "bitch." Wackenhut found out about this incident and disciplined Foust for making the statement. Here, Clark's only complaint is that Wackenhut did not impose enough discipline on Foust. However, an harassment victim may not dictate an employer's action against a co-worker. *Blankenship v. Parke Care Centers*, 123 F.3d 868, 874 (6th Cir. 1997).

Clark also mentions Paul Sheard's testimony to the effect that Paul Thomas told Sheard that SPO Foust once called SPOs Thomas and Earl Campbell "Buckwheat."

Clark also contends that some unidentified employees wrote names like "Superman Shepherd" and "Sexy Lamere" on sign-up sheets for participants in events for Black History Month, an event sponsored by Wackenhut and also by Lockheed Martin. Clark contends that employees were thereby making a joke out of Black History Month. Clark has no idea who wrote these names and admitted that neither he nor anyone else so far as he knew made any complaints to Wackenhut about it. It is undisputed that Wackenhut's upper management had no knowledge of the matters concerning Black History Month that Clark complains about.

Clark further contends that for several months in 2002 he was either "without a computer or his computer was not in working order." However, it is undisputed that other Wackenhut supervisors share computers and Clark was free to use other computers that were available. Clark did get a computer of his own in early 2003. There is nothing in the record to indicate that not having a computer for a few months in 2002 adversely affected Clark's job performance or had anything to do with his race.

Clark also maintains that Gary Brandon, Manager of Wackenhut's Pro Forces at Y-12, singled him out for using his company pager for personal business. However, based on the results of an investigation relating to company pagers, Brandon spoke to Clark about the excessive use of his pager. Clark was simply told

to use common sense and not overdo it and no discipline was imposed. In his deposition, Brandon described Clark as a "good friend," and Clark is not the only employee that Brandon has spoken to about the misuse of a pager.

Another claim which Clark makes about the hostile work environment relates to personnel files of some black Pro Force employees which were found in the Wackenhut conference room in January 2002. Clark testified that on this occasion he told Supervisor Ray McClure that they needed to look at some things in the conference room. However, the fact that some personnel files of black employees were found in the conference room does not support a hostile work environment claim. When Clark raised a concern over the matter, Wackenhut promptly conducted an investigation but was unable to determine how the files got there in the first place or how Clark learned about the files.

Clark also contends that Wackenhut gave him excessive discipline for an incident which occurred on September 6, 2000. It is apparently the only time Clark was disciplined during his employment with Wackenhut. The incident giving rise to the discipline occurred on September 6, 2000, and was undeniably a "serious" matter, as Clark admitted. On that night, two SPO-IIIs were found asleep in the changing house in what is called the Protected Area, a sensitive area of the Y-12 Plant. The two employees were fired and three supervisors, Clark, Hamby and

Webb, were disciplined.  At the time, Clark was the Sector Commander over the part of the Protected Area in which the two sleeping SPO-IIIs were found.  Clark directly supervised them and was responsible for entering the Protected Area and personally contacting them at least twice every shift.  In an affidavit signed in another case, Clark admitted the following:

> I do observe each of my subordinates performance at various times per shift to see that they properly perform their assigned duties.  This is probably my most important supervisory function.  I usually check on each subordinate two times per shift  ...  and it takes me approximately two to three minutes each to observe their work on each round. ...  If they are not where they are supposed to be or doing their job, it would be readily apparent.

Doc. 10, Clark Ex. 6-B, ¶ 22.

Clark admitted that on the night when the two SPOs were found asleep around 2:00 a.m., some eight hours after the start of their shift, he had not even entered the Protected Area, much less contacted either of the two sleeping SPO-IIIs. If Clark had properly discharged his duties, the incident would probably not have occurred.  Wackenhut took the position that Clark's duties and responsibilities were both different and greater than those of Hamby and Webb.  Further, Wackenhut contends that Clark was more culpable than either of the other two supervisors and that that is why he was given a five-day suspension as opposed to a three-day

suspension for Webb and a one-day suspension for Hamby. One of the factors that Wackenhut took into account in deciding upon the discipline to impose was that Hamby accepted responsibility for what happened whereas Clark did not. Under the circumstances, the only reasonable conclusion that a jury could reach is that Wackenhut was justified in tailoring the discipline to the amount of responsibility and acceptance of responsibility that each of the supervisory employees acknowledged in the incident.

In determining whether there was a hostile work environment, courts look to the "totality of the circumstances." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). In this case, considering the totality of the circumstances, a reasonable jury could not find that the alleged racially harassing conduct by either Lockheed Martin or Wackenhut was severe or pervasive enough to constitute a hostile work environment. Instead, it appears that the incidents were infrequent and sporadic, not severe, and neither plaintiff claims that the harassment interfered with their work performance. Under the circumstances, both defendants are entitled to summary judgment on plaintiffs' hostile work environment claims.

# XI.

## *Miscellaneous Claims*

Plaintiffs also make several miscellaneous claims of racial harassment which must be addressed. In December 1999, Clark alleges he was "falsely accused of harassing white female Becky Sue Collins" and as a result was placed on administrative leave and had his weapon removed. However, it is clear that it was not Lockheed Martin who accused Clark of harassing Ms. Collins, but rather the complaint was made by Collins herself. Lockheed Martin took the complaint seriously and conducted a thorough investigation. The investigation took place between December 21, 1999 and January 6, 2000, and the investigator reviewed various documents and interviewed Collins, Clark and their respective witnesses.

After the investigation was completed, Lockheed Martin concluded that Collins' allegations were "neither proved nor disproved," and it so advised Collins and Clark. At that point, in January 2000, Clark was advised not to retaliate against Collins or any of her witnesses. Lockheed Martin confirmed that Clark had had sexual harassment training and was aware of Lockheed Martin's policy against harassment. It is undisputed that Clark was not suspended from work during the investigation, but was rather assigned to work the day shift without a loss of pay. It is also undisputed that this was Lockheed Martin's standard practice in such cases.

It is also Lockheed Martin's standard practice to remove the officer's weapon during such an investigation. In this case, Clark's weapon was temporarily removed because Collins expressed a fear of Clark and what she described as his intimidation and threats. The court finds that no reasonable jury could find that this incident had anything to do with Clark's race. Nor is there any evidence that these charges had any impact on Clark's employment. Rather, Clark continued to receive outstanding performance evaluations even after the incident.

Clark contends that he was somehow retaliated against for filing this lawsuit. However, he is still employed by Wackenhut and continues to receive outstanding evaluations. There is simply no evidence in the record from which the jury could conclude that there has been any retaliation against Clark following the institution of this lawsuit.

Clark also contends that black SPOs are drug-tested more often than white SPOs. However, other than his own unsupported allegation, there is no evidence to support that claim. Nor does he claim that he himself has been drug-tested an inordinate number of times. From the record, there is no support for this claim, nor does Clark have standing to raise it.

Finally, plaintiff Moore argues that he and other African-American employees were "treated differently than white employees" when they had their security clearances lowered in late 2002 to the "L"-level instead of the higher "Q"-level. Moore claims that there were promotions he could have applied for with the "Q" clearance which were not available if one only had an "L" clearance. Moore does not identify those jobs. The record shows that DOE had asked Lockheed Martin in late 1999 to review the clearances of all employees and determine whether some employees could perform with an "L"-level clearance, which is reinvestigated less frequently than the "Q"-level clearance and thus is not as expensive for DOE. This review continued into 2000 when Wackenhut took over the contract, and the review by Wackenhut determined that certain employees in the "Beta #9" position such as Moore had access only to documents of a "classified nature" and not to the more restricted documents limited to personnel with "Q" clearances. Wackenhut explains that it made a legitimate and non-discriminatory business decision to move four employees in the Beta #9 positions from "Q" to "L" clearances. This decision did not affect the salaries, benefits, or working conditions of any of the employees affected, including Moore. In addition, as Moore admits, he lost no pay as a result of the decision, and Wackenhut management listened to his concerns about this issue and reinstated the "Q" clearances for Moore and his "Beta #9" colleagues. Wackenhut did so because it, and DOE, determined that the cost could be described as an operational necessity. The court finds that plaintiff Moore has not, as a matter

of law, established that this temporary reduction in the "Q" clearance is an adverse employment action or that it had any effect upon the terms and conditions or performance of plaintiff's job.

Plaintiffs make two final claims that Lockheed Martin and Wackenhut had a "pattern or practice" of discriminating against blacks on a wholesale basis, and that certain practices of Lockheed Martin and Wackenhut had a "disparate impact" on black guards.

The third amended complaint alleges a "pattern or practice" claim. However, the withdrawal of the class allegations forecloses a pattern or practice claim. *See Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004).

Plaintiffs have not described the policy which had a disparate impact upon blacks. However, the Supreme Court has emphasized the need to carefully distinguish between disparate treatment and disparate impact claims. *Raytheon Co. v. Fernandez*, 540 U.S. 44, 53 (2003). "Disparate impact analysis is used when an employer's racially neutral policy adversely affects a protected class." *Bacon*, 370 F.3d at 576. A plaintiff must identify employment practices as challenged and show their disparate impact on the protected group. *Phillips v. Cohen*, 400 F.3d 388, 397 (6th Cir. 2005). "A practice showing overt prejudice on the basis of a protected

ground, on the other hand, must be challenged in a disparate treatment case."

When a plaintiff has the ability to analyze a "decision-making process" as one "employment practice," a plaintiff may do so only by first establishing that the "elements of [an employer's] decision-making process are not capable of separation for analysis." *See id.*; *citing* 42 U.S.C. § 2000e-2(k)(1)(B)(i).

Establishing a disparate impact claim typically requires the presentation of valid statistical evidence or other such evidence that shows a neutral reason caused a racial disparity. In either case, "statistical disparities must be sufficiently substantial that they raise such an inference of causation." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 (1988). *Accord Phillips*, 400 F.3d at 399 ("In cases involving promotion policies, the relevant inquiry is comparing the number of protected group members benefitting from promotions with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group.").

In this case, the complaint does not set forth with any clarity a facially neutral employment practice. For the most part, the allegations do not allege a racially neutral policy. Rather, they allege only intentional discrimination that can only be addressed under a disparate treatment theory. Even if they could allege a neutral policy, the plaintiffs have presented no evidence that these supported

practices resulted in any racial disparity. Nor have they designated any statistical expert or any expert for that matter who could provide "proof of disparity" using any proper standard of comparison. While "statistical evidence" is not absolutely essential in proving a disparate impact case, there must be proof of disparity using the proper standards for comparison. *Alexander v. Local 496, Laborers Intl. Union of North America*, 177 F.3d 394, 419 (6th Cir. 1999).

Accordingly, defendants are also entitled to summary judgment on plaintiffs' "pattern or practice" claims and on the disparate impact claims.

XII.

***Conclusion***

In light of the foregoing, defendants' motions for summary judgment [Court Files #7, #9, and #11 regarding plaintiff James Clark and Court Files #11, #13, and #15 regarding plaintiff Paul Moore] are hereby GRANTED and this action is hereby DISMISSED.

Enter Judgment Accordingly.

_____ *s/ Thomas W. Phillips*_____
UNITED STATES DISTRICT JUDGE

48